UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAFRAN GROUP, S.A., et al.,<br><br>    Defendants. | Case No. 15-CV-00746-LHK<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE**<br><br>Re: Dkt. No. 85 |

Relators Vincent Hascoet ("Hascoet") and Philippe Desbois ("Desbois") (collectively "Relators"), on behalf of the United States of America and the State of California, sued Safran Group, S.A. ("Safran Global"), Morpho, S.A. a.k.a. Safran Identity & Security, S.A. ("Safran Security"), and Safran U.S.A., Inc. ("Safran USA") (collectively, "Defendants") for violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the California False Claims Act ("California FCA"), Cal. Gov't Code § 12651 *et seq.* Before the Court is Defendant Safran Security's Motion to Dismiss the Third Amended Complaint. ECF No. 85 ("Mot."). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendants' Motion to Dismiss the Third Amended Complaint with prejudice.

1

# I.    BACKGROUND

## A.    Factual Background

This case is an FCA and California FCA *qui tam* action in which the Relators are suing Defendants on behalf of the United States and California. Relators are former employees of Defendants, and Relators bring this action to recover on fraudulent claims for payment that Defendants allegedly submitted to the United States and California. Specifically, Relators allege that Defendants sold the United States and California Russian fingerprint identification technology while representing the Russian fingerprint identification technology as French technology. Additionally, Relators allege that Defendants expressly or impliedly certified that Defendants had complied with the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and the Trade Agreements Act of 1979 ("Trade Act"), 19 U.S.C. §§ 2501–581, even though Defendants were allegedly in violation of both statutes.

The Court first describes the corporate structure of Defendants and related entities as alleged in the Third Amended Complaint ("TAC"). The Court then describes Relators' relationship with Defendants, and finally describes the violations alleged in the TAC.

### 1.    Corporate Structure of Defendants and Related Entities

Relators allege that Defendant Safran Global is a corporation that was formed under the laws of France in 2005 through the merger of Sagem Securite S.A. ("Sagem") and Snecma S.A. ("Snecma"). TAC ¶ 9. Although Safran Global was allegedly formed through the merger of Sagem and Snecma, Relators allege that both Sagem and Snecma continue to operate as subsidiaries of Safran Global. *Id.* ¶ 12. Sagem "develops and supplies high-precision opto-mechanical, electronics, and optical solutions for defense, astronomy, research, and industry applications worldwide." *Id.* Snecma "designs, develops, produces and markets engines for civil and military aircraft, launch vehicles and satellites." *Id.*

Relators contend that Safran Global maintains "a labyrinthine convoluted tangled web of agent subsidiary entities that [Safran Global] . . . directly and indirectly wholly owns and uses as agents in an ever-changing shell game." *Id.* ¶ 9. Specifically, Relators allege that Defendant

2

Safran Global does business in California and the rest of the United States through several other subsidiaries: Defendant Safran USA, Defendant Safran Security, nonparty MorphoTrak, LLC ("MorphoTrak"), and nonparty MorphoTrust USA, LLC ("MorphoTrust"). *Id.* ¶ 10. Safran USA is a Delaware corporation that is 97.5% owned by Safran Global and 2.5% owned by Safran Security. *Id.* Safran Security is a French corporation and, until May 2016, was named "Morpho." *Id.* ¶ 13. Safran Security is 75% owned by Safran Global and 25% owned by Safran USA. *Id.* MorphoTrak is a Delaware corporation that was formed in April 2009 and is headquartered near Washington, D.C. *Id.* ¶¶ 10, 15. MorphoTrak is wholly owned by Safran USA. *Id.* ¶ 15. MorphoTrust is also a Delaware corporation, *id.* ¶ 10, and it is also wholly owned by Safran USA, *id.* ¶ 14.

### 2. Relators' Relationship with Defendants

Relators allege that they were employees of Defendants and entities related to Defendants. *Id.* ¶ 4 ("Both are former employees [of] entities of [Safran Global]."). Relator Desbois is a French national who lives in Russia. *Id.* ¶ 6. Desbois worked for Defendants or entities related to Defendants from November 2007 to September 2014. *Id.* Specifically, Desbois first was the Chief Financial Officer in the Russian branch of Safran Global. *Id.* Later, Desbois served as the Chief Executive Officer ("CEO") of "Morpho Russia." *Id.* Desbois' job at "Morpho Russia" ended in September 2014. It is unclear from the TAC whether Desbois quit or was terminated.

Relator Hascoet is also a French national who lives in Russia. *Id.* ¶ 7. From July 23, 2012 to May 31, 2014, Hascoet was the Deputy Director of the Russian branch of PowerJet. *Id.* PowerJet was a "joint venture" between Snecma and another company named "NPO Saturn." *Id.* Relators provide no further detail about PowerJet or NPO Saturn. Relators allege that Hascoet wrote a "comprehensive report" for Snecma in which Hascoet outlined "myriad acts of bribery, unlawful gifts, bogus transactions, tax evasion, and false certifications of compliance with laws." *Id.* The TAC does not specify whether these actions in the report occurred at PowerJet alone or occurred as part of Safran Global's operations more generally. Relators allege that Hascoet's

employment was terminated due to his "complaints and reports about these compliance issues." *Id.*

During Relators' tenures at Defendants and entities related to Defendants, Hascoet and Desbois "engaged in extensive professional communications with one another regarding compliance issues," including the issues that are the focus of the instant suit. *Id.* Allegedly, "Desbois and Hascoet also closely collaborated in regard to communicating with the United States Securities & Exchange Commission ("SEC") regarding Defendants' serious issues of noncompliance." *Id.*

### 3. Defendants' Alleged Wrongdoings

Based on this alleged insider information, Relators make three allegations as the basis of their FCA and California FCA claims. First, Relators allege that Defendants sold fingerprint identification products created by Safran Security to the United States and California. *Id.* ¶ 14. Relators allege that "Defendants falsely claimed that the algorithms technology used in such [Safran Security] fingerprint identification technology was, and is, *French* technology," when in fact it was "prohibited *Russian* technology." *Id.* ¶ 16. Second, Relators allege that Defendants expressly or impliedly certified that Defendants had complied with the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, when in fact it had an agreement with a Russian company called Papillon not to compete in each other's markets. Third, Relators allege that Defendants expressly or impliedly certified that they had complied with the Trade Act, 19 U.S.C. §§ 2501–581, even though Defendants were allegedly in violation of the Trade Act.

### a. The Fingerprint Identification Product Sale Allegations

First, Relators allege a scheme wherein Defendants sold Russian fingerprint identification products to the United States and California, but misrepresented to the United States and California that these fingerprint identification products were French technology.

Specifically, Relators allege that Sagem, a subsidiary of Safran Global, entered a secret technology licensing agreement on July 2, 2008, with Papillon Software and Papillon Technology

for Fingerprint and Palmprint Recognition, dba Papillon ZAO ("Papillon"). Pursuant to this agreement, Papillon licensed its fingerprint identification technology to Sagem. *Id.* ¶¶ 16, 18. Papillon is a Russian corporation formed by Russian ex-military personnel. *Id.* ¶ 17. In exchange for the use of the technology, Sagem paid Papillon 3,795,000 Euros plus yearly fees. *Id.* ¶ 18. Relators allege that Jean-Paul Jainsky, who was Sagem's CEO at the time but who is now employed at Safran Global in an unspecified role, was involved in making and concealing the Papillon licensing agreement. *Id.* ¶ 18. Relators also allege that current Safran Global CEO Philippe Petitcolin participated in concealing the Papillon licensing agreement. *Id.*

Relators allege that the Papillon licensing agreement states that the technology that was licensed to Sagem was Russian technology. TAC ¶ 20. In support of this allegation, Relators quote the definitions section of the agreement, which provides, "'Papillon Technology means Russian and foreign Patents, Patent applications, and Copyrights, and the know-how, computer software, technical, and operational information in each case which are owned by or licensed to Licensor, and falling within the Licensed field." *Id.* The Papillon fingerprint identification technology was five times more efficient that Sagem's own fingerprint identification algorithms. *Id.* ¶ 18. Safran Security incorporated the Papillon technology into its fingerprint identification product. *Id.* ¶ 19. Specifically, Relators allege that at some point between 2007 and 2010, a Safran Security project manager named Frank Barret and his team of software engineers received "five Papillon algorithms from Russia" from Safran Global's top management and that Barret and his team incorporated the Papillon algorithms into Safran Security's fingerprint identification software. *Id.*

Relators allege several sales of the fingerprint identification products by Safran Global subsidiaries to government entities. First, Relators contend that Barret "knew about the Russian origin of the algorithms, and he participated in the sale of such [fingerprint identification] products containing these algorithms to U.S. agencies and California agencies." *Id.* The TAC does not provide any details on the sales in which Barret allegedly participated.

Second, Relators allege that on or about September 9, 2009, Lockheed Martin awarded MorphoTrak a contract to provide fingerprint identification technology for the FBI's Next Generation Identification system. *Id.* ¶ 23. MorphoTrak in turn awarded Bio-Key International Inc. a contract for "building a fingerprint biometric identity solution on the fusion of Bio-[K]ey and MorphoTrak algorithms as part of the contract awarded by Lockheed Martin[] to MorphoTrak." *Id.* ¶ 25. The Next Generation Identification system improvements became operational in May 2013. *Id.* ¶ 28.

MorphoTrak President and CEO Daniel Vassy allegedly obtained the Lockheed Martin contract "based on knowingly false representations by Jean-Paul Jainsky and other Safran [Global] top management, to Mr. Vassy" that the fingerprint identification technology was French technology. *Id.* Relators allege that Jainsky, along with Morpho France[1] Senior Vice President for Corporate Sales Development Francois Perrachon and Antoine Grenier, "who was in charge of all legal aspects," made numerous visits to the United States and were "instrumental" in the negotiation of the Lockheed Martin contract. *Id.* ¶ 24. Relators contend that Jainsky, Perrachon, and Grenier "were fully aware of the Russian origin of the algorithms they were selling," but knowingly and fraudulently concealed the origin information from the United States Government and the State of California. *Id.*

Third, Relators allege that in September 2009, Safran Global, "by and through its agents and subsidiaries, including specifically" MorphoTrust, executed a U.S. General Services Administration ("GSA") Technology Schedule 70 contract. TAC ¶ 29. The TAC does not detail what technology was offered pursuant to the Schedule 70 contract.

Fourth, Relators allege that on December 4, 2012, MorphoTrust CEO Robert A. Eckel signed a blanket purchase agreement ("BPA") with the U.S. Department of Justice for purchases of JABS fingerprint and palm print identification equipment. TAC ¶ 29. This BPA was made

---

[1] The TAC identifies Morpho France as a subsidiary of the "Safran Defendants," but does not further specify the ownership of Morpho France. TAC ¶ 24.

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

pursuant to GSA Schedule Contract No. GS-35F-0904P. TAC ¶ 29. The TAC does not specify whether this equipment included software, hardware, or both.

Relators contend that both the Schedule 70 contract and the BPA impose "DOJ Security Requirements" that include "elaborate pre-screening and investigation duties and security certifications related to the systems (e.g., extensive background checks for all contractors used, use of foreign nationals only from countries that are allied with the United States, and complete prohibition against use of non-U.S. citizens in the development, operation, management, or maintenance of DOJ IT systems unless a rare high-level waiver has been granted)." TAC ¶ 29. The Schedule 70 contract and BPA allegedly contain a certification that MorphoTrak required all subcontractors to adhere to all security requirements of the contracts. *Id.* According to Relators, because Eckel did not disclose MorphoTrak's alleged subcontractor relationship with Papillon, Eckel's certification was knowingly false. *Id.*

### b. The Antitrust Allegations

Second, Relators allege that Defendants and Papillon reached an agreement where they would "divide up the world market for fingerprint identification products, and would not compete in each other's market." *Id.* ¶ 31. Defendants had the "exclusive rights to sell in the United States, most of Western Europe, the U.A.E., and some other Middle Eastern countries." *Id.* ¶¶ 2, 31. Papillon, in turn, had exclusive rights to sell in Russia, Turkey, China, Taiwan, Kazakhstan, Mongolia, Poland, Tajikistan, Albania, and other Asian markets. *Id.* ¶ 2. Relator Desbois contends that "higher management" informed him of this agreement while he was CEO of Morpho Russia. *Id.* ¶ 6. Relators allege that this agreement violated the Federal Acquisition Regulation and the Sherman Antitrust Act, 15 U.S.C. §§ 1–7. TAC ¶ 32. This violation allegedly rendered Defendants' claims for payment false because Defendants had made written representations to the United States and California that certified compliance with the Federal Acquisition Regulations and the Sherman Antitrust Act. *Id.*

United States District Court
Northern District of California

### c. The Trade Agreement Allegations

Third, Relators allege that Defendants' personnel handling government sales "routinely and regularly falsely certified, in writing," that Defendants were in compliance with the Trade Act, 19 U.S.C. §§ 2501–2581. Relators contend that products are only Trade Act compliant if they are made in the United States or one of the designated countries listed in the Code of Federal Regulations, 48 C.F.R. 25.003. TAC ¶ 34. Russia is not one of the designated countries, which allegedly renders Defendants' representations false.

### B. Procedural History

On February 17, 2015, Relators filed this case under seal in this Court. ECF No. 1. On April 19, 2016, the United States declined to intervene. ECF No. 5. On July 29, 2016, California also declined to intervene. ECF No. 13. On August 5, 2016, this case was unsealed. ECF No. 14.

On August 10, 2016, Relators filed a first amended complaint. ECF No. 16. On October 25, 2016, Relators filed a second amended complaint ("SAC"). ECF No. 38.

On November 8, 2016, Safran USA filed a motion to dismiss the SAC, ECF No. 45, in which Safran USA made three arguments. First, Safran USA argued that Relators had failed to plead a claim with sufficient particularity under Federal Rule of Civil Procedure 9(b). Second, Safran USA argued that Relators had failed to sufficiently allege scienter under Federal Rule of Civil Procedure 8(a). Third, Safran USA argued that Relators had failed to show that they are the "original source" of the allegations against Safran USA. Relators opposed the motion to dismiss on November 22, 2016. ECF No. 45. Safran USA filed a reply on November 29, 2016. ECF No. 46.

On January 19, 2017, this Court dismissed the SAC without prejudice. ECF No. 54. Specifically, the Court held that Relators had failed to plead a claim with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b). ECF No. 54. The Court ordered that if Relators chose to file an amended complaint, they must do so within twenty-one days. Accordingly, the deadline for Relators to file an amended complaint was February 9, 2017. The

Court noted that "[f]ailure to meet the twenty-one day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice of Relators' deficient claims and deficient prayer for damages." *Id.* at 24. The Court also ordered that "Relators may not add new causes of action or parties without leave of the Court or stipulation of the parties." *Id.*

On February 10, 2017, the day after the deadline for Relators to file a third amended complaint, Defendants filed a Notice of Relators' Non-Filing of Third Amended Complaint and requested that the Court dismiss the SAC with prejudice and without leave to amend. ECF No. 59. That same day, Relators filed a third amended complaint. ECF No. 60. Relators also filed an Ex Parte Application Pursuant to FRCP 60(b)(1) for Relief From January 19, 2017 Order Granting Relators 21 Days to File Third Amended Complaint, Where Relators' Counsel Mistakenly Calendared the Due Date as February 10 and Thus E-Filed Such Third Amended Complaint One Day Late. ECF No. 61("Ex Parte Application").

Defendants filed an opposition to Relators' Ex Parte Application on February 10, 2017. ECF No. 64. In Defendants' opposition, Defendants argued that Relators had acknowledged the correct deadline to file a TAC in a separate filing to the Court on February 1, 2017, and so Relators should not be permitted to file the TAC late. In addition, Defendants argued that new parties had been added to the late-filed TAC, namely, MorphoTrak and MorphoTrust. Defendants argued that Relators' addition of the new Defendants without Court order was in violation of the Court's January 19, 2017, order granting Safran USA's motion to dismiss. ECF No. 64.

On February 12, 2017, Relators filed a reply to Defendants' opposition. ECF No. 65. Defendants filed a sur-reply on February 14, 2017. ECF No. 67.

On February 17, 2017, the Court granted Relators' Ex Parte Application and allowed Relators to file the TAC past the February 9, 2017 deadline. ECF No. 68. However, the Court did not allow Relators to add new defendants to the TAC. Rather, the Court noted that new parties could only be added to the TAC by leave of Court, which Relators had not requested. ECF No.

United States District Court
Northern District of California

68.

On February 28, 2017, Relators filed a Motion for Leave to File a Fourth Amended Complaint, which sought leave of Court to add MorphoTrak and MorphoTrust as defendants. ECF Nos. 73, 78. On March 14, 2017, Defendants filed an opposition, ECF No. 79. On March 20, 2017, Relators filed a reply. ECF No. 80.

On May 9, 2017, the Court denied Relators' Motion for Leave to File Fourth Amended Complaint and struck MorphoTrust and MorphoTrak as defendants from the TAC. ECF No. 83. On May 12, 2017, Relators filed a revised TAC removing MorphoTrust and MorphoTrak as defendants. ECF No. 84.

On May 26, 2017, Defendants filed a Motion to Dismiss the Third Amended Complaint. ECF No. 85 ("Mot."). Defendants argue that the TAC suffers from the same three deficiencies as the SAC: (1) failure to plead a claim with sufficient particularity under Federal Rule of Civil Procedure 9(b); (2) failure to sufficiently allege scienter under Federal Rule of Civil Procedure 8(a); and (3) failure to show that Relators are the "original source" of the allegations against Defendants. *See* Mot. at 1-2. Defendants also filed a request for judicial notice. Relators filed an opposition on June 9, 2017, ECF No. 86 ("Opp'n"), and Defendants filed a reply on June 16, 2017, ECF No. 90 ("Reply"). Defendants also filed evidentiary objections to the declarations that Relators filed in support of their opposition. ECF No. 91.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Nonetheless, the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

**B.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(b)**

"When an entire complaint . . . is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint . . . ." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). The Ninth Circuit has recognized that "it is established law in this and other circuits that such dismissals are appropriate," even though "there is no explicit basis in the text of the federal rules for the dismissal of a complaint for failure to satisfy 9(b)." *Id.* A motion to dismiss a complaint "under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.*

**C.      Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted). Generally, leave to amend shall be denied

only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

### A. Defendants' Request for Judicial Notice

In support of the instant motion, Defendants request judicial notice of fifteen documents, including (1) rulings issued by U.S. Customs and Border Protection (the "Customs Rulings"), (2) various brochures, press releases, websites, and news articles; and (3) Frank Barret's LinkedIn profile. ECF No. 85-4. Relators did not file an opposition to the request for judicial notice, but Relators did file declarations in opposition to the instant motion in which they commented on some of Defendants' requests for judicial notice. ECF Nos. 87, 88. Safran Security in turn filed evidentiary objections to Relators' declarations, ECF No. 91, and Safran Global and Safran USA joined Safran Security's objections, ECF No. 92.

The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records, including judgments and other publicly filed documents, are proper subjects of judicial notice. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("[Courts] may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute.") (internal quotation marks omitted), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Defendants request judicial notice of Customs Ruling HQ H268858 (Feb. 12, 2016) and

Customs Ruling HQ H243606 (Dec. 4, 2013), which determine the country of origin of software products unrelated to those at issue in the instant case. *See* ECF No. 85-4 at 1, Exhibits B-C. Such rulings are the official records of decisions made by the Customs Service. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 222-23 (2001) (generally describing Customs ruling letters); 19 C.F.R. § 177.9 ("A ruling letter issued by the Customs Service under the provisions of this part represents the official position of the Customs Service with respect to the particular transaction or issue described therein . . . ."). Judicial notice of such public records is appropriate. *See United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008) ("Judicial notice is appropriate for records and reports of administrative bodies." (internal quotation marks omitted)); *Minor v. FedEx Office & Print Servs., Inc.*, 78 F. Supp. 3d 1021, 1027-28 (N.D. Cal. 2015) (applying *14.02 Acres of Land* to grant judicial notice of administrative agency records). Relators do not object to judicial notice of the Customs Rulings. Accordingly, the Court GRANTS Defendants' request for judicial notice of the Customs Rulings.

Defendants also request judicial notice of twelve documents that include brochures for Defendants and their subsidiaries, articles and press releases about Defendants' subsidiaries and the FBI's Next Generation Identification project, a record of the contract transaction for the DOJ's BPA for fingerprint scanners, and a list of Trade Act "Designated Countries" from the website "FEDSched." ECF No. 85-4 at 1-3, Exhibits A, D-N. A Court may only take judicial notice of publications to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir.1999) ("When considering a motion for judgment on the pleadings, this court may consider facts that 'are contained in materials of which the court may take judicial notice.' We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants"). Defendants offer these documents "to show that Relators are not the 'original source' of the information in their TAC." ECF No. 85-4 at 5. Defendants state that

13

these documents "are not being offered for the truth of the matter asserted therein." *Id.* Courts in FCA cases regularly grant judicial notice of websites and news reports for the purpose of determining whether the fraud alleged in the complaint had already been publicly disclosed. *See, e.g.*, *United States ex rel. Hong v. Newport Sensors, Inc.*, SACV 13-1164-JLS, 2016 WL 8929246, at *3 (C.D. Cal. 2016); *United States ex rel. Carter v. Bridgepoint Educ., Inc.*, No. 10-CV-1401, 2015 WL 4892259, at *3-6 & n.2 (S.D. Cal. Aug. 17, 2015). Accordingly, the Court GRANTS Defendants' request for judicial notice of the documents identified as Exhibits A and D-N in ECF Number 85-4. The Court only considers these documents as evidence of what information is available in the public realm. The Court does not consider the documents for the truth of the matters asserted therein.[2] *See Von Saher*, 592 F.3d at 960; *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 111 (N.D. Cal. 2009) (taking judicial notice of the existence of press releases and news articles but not the truth of their contents).

Finally, Defendants request judicial notice of Frank Barret's LinkedIn profile. ECF No. 85-4 at 3; Exhibit O. Relators declare that they personally and carefully read Barret's LinkedIn profile as late as 2016. ECF No. 87 ¶ 4(c); ECF No. 88 ¶ 4(c). They contend in their declarations that Barret's LinkedIn profile has been altered since 2016 to remove previous references to Barret's work integrating the Papillon algorithms into Safran Security's fingerprint identification software.[3] *Id.* The Court finds that Relators' declarations raise a reasonable dispute as to the reliability of the substance of Barret's LinkedIn profile. As a result, the Court DECLINES to take judicial notice of Barret's LinkedIn profile. *See Lee*, 250 F.3d at 689.

---

[2] Relators contend in their declarations that Defendants' references to some of these judicially noticeable documents are misleading. *See* ECF No. 87 ¶ 4(a)-(b); ECF No. 88 ¶ 4(a)-(b). The Court does not construe these arguments as objections to whether the documents are judicially noticeable, but rather as arguments about the legal significance of the documents.

[3] Defendants object to Relators' statement that Barret's LinkedIn profile has been altered based on Federal Rules of Evidence 401, 402, 602, and 1002. *See* ECF No. 91, Objection No. 9. The Court finds that Relators' statement is relevant to determining whether judicial notice of Barret's LinkedIn profile is appropriate. The Court also finds that Relators' declaration that they personally reviewed Barret's profile in 2016 sufficiently establishes a foundation for their statements. Defendants' objections are OVERRULED. Defendants' other objections to Relators' declarations, *see* ECF No. 91, are OVERRULED as moot.

14

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

**B.** **Defendants' Motion to Dismiss**

Defendants make three arguments in their Motion to Dismiss the TAC. First, Defendants argue that Relators have not pled a claim with sufficient particularity under Federal Rule of Civil Procedure 9(b). Second, Defendants argue that Relators have not sufficiently alleged scienter under *Twombly*, *Iqbal*, and Federal Rule of Civil Procedure 8(a). Finally, Defendants argue that this Court lacks subject matter jurisdiction because Relators are not the "original source" of the allegations against Defendants. Because the Court concludes that the TAC fails to meet Rule 9(b)'s standard for particularity, it need not address Defendants' scienter and "original source" arguments.

The Court first discusses the elements of an FCA cause of action, then discusses the pleading standard under Rule 9(b) in the FCA context, and finally discusses whether Relators have satisfied the Rule 9(b) standard.

**1.** **Elements of an FCA Cause of Action**

Relators bring causes of action under five statutory provisions of the FCA and the California FCA: (1) presentation of a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(A); (2) making or using a false statement material to a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B); (3) presentation of a false or fraudulent claim under California Government Code § 12651(a)(1); (4) making or using a false statement material to a false or fraudulent claim under California Government Code § 12651(a)(2); and (5) failure to disclose a false claim after discovering its falsity under California Government Code § 12651(a)(8).

The elements of Relators' first four causes of action are the same. The first two causes of action, which are brought under §§ 3729(a)(1)(A) and (a)(1)(B) of the FCA, prohibit a party from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," and from making or using "a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). The third and fourth causes of action are brought under substantially identical portions of the California FCA. Cal. Gov't Code § 12651(a)(1) &

(a)(2) (creating liability where a person "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim").  Where, as here, the statutory provisions of the federal FCA and California FCA are the same, courts apply the same analysis to federal and California FCA claims.  *Fassberg Const. Co. v. Hous. Auth. of City of L.A.*, 152 Cal. App. 4th 720, 735 (2007) (as modified) (holding that federal case law is used to interpret the California FCA because "[t]he California False Claims Act is patterned after the federal False Claims Act"); *see also Stoner v. Santa Clara Cty. Office of Educ.*, 400 F. App'x 185, 186 (9th Cir. 2010) (finding the issues to be decided in a federal FCA and California FCA case to be identical).

The term "claim" in the FCA context means "any request or demand, whether under a contract or otherwise, for money or property."  31 U.S.C. § 3729(b)(2); *see also* Cal. Gov. Code § 12650(b)(1).  The "archetypal" FCA case involves situations where the "claim for payment is itself literally false or fraudulent."  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).  However, courts have recognized two other theories under which an FCA action can be brought: "(1) false certification (either express or implied) [or] (2) promissory fraud."  *Hendow*, 461 F.3d at 1171; *see also Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) (recognizing validity of implied false certification theory); *S.F. Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*, 182 Cal. App. 4th 438, 450 (2010) (as modified) (applying federal false certification theory to California FCA cases).  Under a "false certification" theory, a defendant can be held liable under the FCA where the defendant "falsely certifies compliance with a statute or regulation as a condition to government payment."  *Hendow*, 461 F.3d at 1171.  Under the "promissory fraud" theory, also called the "fraud-in-the-inducement" theory, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct."  *Id.* at 1173.

Under either the false certification theory or the promissory fraud theory of liability, the

Ninth Circuit has held that the elements are the same. *Id.* The essential elements of FCA liability under § 3729 (a)(1)(A) or (a)(1)(B)—and thus the elements of liability under the identical provisions of the California FCA—are "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174. Notably, "the [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment,'" that is, the fraudulent actions that "cause" the government to make a payment. *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).

Relators' fifth cause of action is brought under California Government Code § 12651(a)(8). That provision holds that a beneficiary of a claim who "subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim" is liable under the California FCA. *Id.* Relators bring their cause of action under § 12651(a)(8) in the alternative to Relators' first four causes of action. Specifically, Relators bring Count Five in case "the finder of fact determines that any [of] Defendants' submission of the above-referenced false claims to the State of California was inadvertent, rather than knowing." TAC ¶ 53.

The elements of a claim under § 12651(a)(8) are identical to the elements of a claim under the other federal and California FCA provisions, except that a Relator does not have to allege scienter at the time the defendant submitted a claim to the government. *See E. Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure, Inc.*, 2013 WL 6698897, at *2 (N.D. Cal. Dec. 19, 2013) (analyzing claim under § 12651(a)(8) identically to claims under § 12651(a)(1) and (a)(2) for the purposes of Rule 9(b)). However, as discussed further below, the Court need not reach the issue of scienter to resolve the instant motion to dismiss. Thus, for purposes of the instant motion to dismiss, the analysis of Claims One through Four are identical to the analysis of Claim Five.

The Court next turns to the requirements of Rule 9(b) in the FCA context and then addresses whether Relators have pled with particularity the elements of an FCA cause of action

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

under Rule 9(b).

### 2. The Rule 9(b) Standard in FCA Cases

Claims sounding in fraud, including claims under the FCA, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under the federal rules, a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F. 3d at 1106 (citation omitted). When there are multiple defendants in a case, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" *Swartz*, 476 F.3d at 764–65 (citation omitted).

Although a certain level of detail is required, the Ninth Circuit has specified that a plaintiff need not "identify representative examples of false claims to support every allegation." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Regardless, the Ninth Circuit has specified that the requirements of Rule 9(b)—the who, what, where, when, and how—have not been relaxed when analyzing claims made pursuant to the FCA. *Id.* at 999 ("[The Plaintiff] argues that the traditional pleading standards for fraud under Rule 9(b) should be relaxed here . . . . We are not persuaded."). Accordingly, an FCA plaintiff must allege, at the very least, "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong

18

inference that [false] claims were actually submitted." *Id.* (citation omitted). Specific

representative examples of false claims are one, but not the only way, to satisfy Rule 9(b) in the

FCA context. *Id.*

### 3. Sufficiency of Relators' Allegations Under Rule 9(b)

The Court next turns to whether Relators here have sufficiently alleged an FCA claim

against Defendants. As discussed above, Relators must plead "(1) a false statement or fraudulent

course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay

out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174 (9th Cir. 2006). With the exception

of element 2, scienter, these elements must be pled with particularity under Rule 9(b). For the

reasons discussed below, the Court concludes that the TAC still suffers from the same

fundamental flaws that led to the dismissal of the SAC. Namely, the TAC fails to plead specific

facts connecting Defendant Safran USA to the alleged fraud, and the TAC fails to allege sufficient

details of the fraud.

### a. The Allegations Against Safran USA and Impermissible Lumping

First, the Court discusses whether adequate factual allegations have been made to connect

Defendant Safran USA to the fraudulent conduct at issue in the instant lawsuit. As the Court

explained in its order dismissing Relators' SAC, a relator alleging an FCA claim must provide an

adequate factual basis connecting the relator's FCA claim to the particular defendant. *United*

*States ex rel. Swoben v. United Healthcare Insurance Co.*, 848 F.3d 1161, 1181-82 (9th Cir. 2016)

(finding that, even though some details were provided of a fraudulent scheme, there were

insufficient facts connecting some defendants to those fraudulent actions). In dismissing Relators'

SAC, the Court noted that Relators' SAC devoted only one paragraph to generally describing

Safran USA's operations in the United States. SAC ¶ 10. The SAC's other allegations were

directed against Defendants collectively. *Id.* ¶¶ 10-25. Accordingly, this Court held that Relators'

allegations in the SAC were insufficient to satisfy Rule 9(b) because Relators failed to specifically

link Safran USA to the alleged fraud. Rather, the allegations in the SAC "impermissibly lump[ed]

United States District Court
Northern District of California

the three Defendants together." *United States v. Safran Group, S.A.*, No. 15-CV-00746-LHK, 2017 WL 235197, at *8-9 (N.D. Cal. Jan. 19, 2017); ECF No. 54 at 14-17.

Significantly, the TAC adds no new facts directly connecting Safran USA to the alleged fraud. As such, the generalized allegations made against the three "Defendants" rather than against Safran USA specifically make it impossible to "discern[] which entity . . is [making the false representations and certifications] and which is selling the products." *United States ex rel. Pecanic v. Sumitomo Elec. Interconnect Prod., Inc.*, 2013 WL 774177, at *4–5 (S.D. Cal. Feb. 28, 2013); *see also Gonzalez v. Planned Parenthood of L.A.*, 2011 WL 1481398, at *8 (C.D. Cal. Apr. 19, 2011) ("As the FAC stands, it merely alleges "defendants" as a whole engaged in particular behavior, and is deficient in that respect."). Thus, because the TAC does not allege any facts regarding the sale of fingerprint identification products or false representations against Safran USA specifically,[4] dismissal of the TAC as to Safran USA is warranted.

### b. The Allegations Against Safran Global and Safran Security

The Court next turns to whether Relators have pled their claims against Safran Global and Safran Security with sufficient particularity. As set forth above, "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso ex rel. United States v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid*, 616 F.3d at 998). If, as here, Relators do not identify any specific false claim requesting money from the Government, they must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that [false] claims were

---

[4] The TAC does add specific allegations against MorphoTrak and MorphoTrust, both of which are wholly owned by Safran USA. *See* TAC ¶¶ 14-15, 23, 25, 28-29. It does not, however, adequately allege an alter-ego theory that would permit imputing liability for MorphoTrak's or MorphoTrust's actions to Safran USA. *See Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) ("The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law."); *Pecanic*, 2013 WL 774177 at *4-5 (holding that if one corporation were to be held responsible for the actions of the other in an FCA case, the relator would need to adequately allege an alter-ego theory).

20

actually submitted." *Ebeid*, 616 F.3d at 999. As discussed above, Relators identify three misrepresentations that allegedly render Defendants' claims false: (1) the failure to identify Russia as the origin of parts of the fingerprint identification software; (2) the express or implied certification that Defendants complied with the FAR and Sherman Act; and (3) the express or implied certification that Defendants complied with the Trade Act. The Court addresses each alleged misrepresentation in turn.

### i. Concealing the Russian Origin of the Fingerprint Identification Software

The Court first considers whether Relators have pled the "particular details of a scheme to submit false claims" with sufficient particularity under Rule 9(b). The Court then turns to whether Relators have sufficiently pled "reliable indicia that lead to a strong inference that [false] claims were submitted." With regard to the scheme to submit false claims, Relators allege that on July 2, 2008, Sagem, a Safran Global subsidiary, entered into a secret licensing agreement with Russian company Papillon. TAC ¶ 18. In exchange for the use of Papillon's fingerprint identification technology, Sagem paid Papillon 3,795,000 Euros plus a yearly fee. *Id.* Sagem's then-CEO Jean-Paul Jainsky oversaw the licensing agreement and participated in concealing the agreement from employees of Safran Global, its subsidiaries, and its customers. *Id.* ¶¶ 18-19. Current Safran Global CEO Philippe Petitcolin also participated in concealing the alleged Russian origin[5] of the

---

[5] The Court notes that it is far from clear that the fingerprint identification technology ultimately sold by Defendants or their subsidiaries would legally qualify as Russian-origin technology. *See United States ex rel. Sandager v. Dell Marketing, L.P.*, 872 F. Supp. 2d 801, 804-05 (D. Minn. 2012) (observing that the Trade Act "requires that the products sold to the Government be made or 'substantially transformed' in the United States or certain designated countries," where 19 U.S.C. § 2518(4)(B) defines "substantially transformed" as meaning that the product was "transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed"); Defendants' Request for Judicial Notice Exhibits B-C (raising the possibility that U.S. Customs and Border Protection would consider the fingerprint identification technology to originate in France under the "substantial transformation" test); TAC ¶ 20 (defining the technology licensed by Papillon to Sagem as "Russian **and foreign** Patents, Patent applications, and Copyrights . . .") (emphasis added); TAC ¶ 25 (alleging that MorphoTrak awarded a subcontract to Bio-Key International to "build[] a fingerprint biometric identity solution **on the fusion of Bio-[K]ey and MorphoTrak algorithms** as part of the contract awarded by Lockheed Martin") (emphasis added). However, on a motion to dismiss, the Court must presume "all factual allegations of the complaint to be true" and "draw all reasonable inferences in favor of" Relators. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th

21

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

fingerprint identification technology. *Id.* The Papillon technology was incorporated into Safran Security's fingerprint identification products in France at some point between 2007 and 2010 by a team of software engineers led by Frank Barret. *Id.* ¶ 19. Barret knew about the origin of the algorithms. *Id.* Jainsky, Petitcolin, Barret, and other unnamed senior Safran Global officials did not disclose to its U.S. or California customers the alleged Russian origin of its fingerprint identification technology. *Id.* ¶¶ 2, 9, 16, 18-19, 23-24, 29.

The Court concludes that Relators have sufficiently pled the "who, what, when, where, and how" of the general misconduct that Relators allege underpins Defendants' false claims. Unlike their allegations against Safran USA, Relators' allegations sufficiently identify individuals at Safran Global and Safran Security who are alleged to have participated in the underlying fraudulent conduct. The Court next analyzes whether Relators have sufficiently pled "reliable indicia that lead to a strong inference that [false] claims were actually submitted." *Ebeid*, 616 F.3d at 999. The Court also considers whether Relators sufficiently allege whether Defendants were involved in the submission of any false claims.

In the TAC, Relators include details of roughly four sales or contracts that they allege are fraudulent for failure to disclose the alleged Russian origin of the fingerprint identification software: (1) Frank Barret's participation in unspecified sales of fingerprint identification products, TAC ¶ 19; (2) MorphoTrak's 2009 contract with Lockheed Martin related to the FBI's Next Generation Identification system, TAC ¶¶ 23-28; (3) MorphoTrust's 2009 Schedule 70 contract with GSA, TAC ¶ 29; and (4) MorphoTrust's 2012 BPA with the U.S. Department of Justice, TAC ¶ 29. The Court addresses each in turn.

### a. Frank Barret's Participation in Unspecified Sales

Relators allege that Barret participated in the sale of fingerprint identification products to unspecified U.S. and California agencies while he was employed with Safran Security. Safran

---

Cir. 2000) (internal quotation marks omitted). As a result, the Court assumes for the purposes of deciding Defendants' motion to dismiss that the fingerprint identification technology at issue would be considered Russian in origin.

22

Global managers allegedly fraudulently concealed the alleged Russian origin of the technology during these sales. TAC ¶ 19. However, the TAC does not give any specifics on these alleged sales. The TAC does not detail which company sold what products, to which customers, or when. The TAC's conclusory allegation that Barret participated in the sale of fingerprint identification products to unspecified U.S. and California customers does not constitute a "reliable [indicator] that lead to a strong inference that [false] claims were actually submitted." *Ebeid*, 616 F.3d at 999; *see also Swoben*, 848 F.3d at 1182 (holding that general allegations of fraud did not supply the type of reliable indicia required by *Ebeid*).

### b. The Lockheed Martin Contract

Relators next allege that on September 9, 2009, nonparty MorphoTrak obtained a contract from Lockheed Martin to provide fingerprint identification technology for the FBI's Next Generation Identification system. TAC ¶ 23. In turn, MorphoTrak awarded a subcontract to Bio-Key International to "build[] a fingerprint biometric identity solution on the fusion of Bio-[K]ey and MorphoTrak algorithms as part of the contract awarded by Lockheed Martin[]." *Id.* ¶ 25. Relators allege that the MorphoTrak technology began to be deployed at the FBI in March 2011, *id.* ¶ 27, and that the Next Generation Identification system became operational in May 2013, *id.* ¶ 28.

The Court finds that the details of the Lockheed Martin contract, together with specific allegations of when the MorphoTrak technology was deployed at the FBI, constitute "reliable indicia that lead to a strong inference that [false] claims were actually submitted."[6] *Ebeid*, 616 F.3d at 999. However, the Court nonetheless concludes that Relators' claims fail to sufficiently allege that any Defendants were involved in or caused the submission of any MorphoTrak claims. As the Court already held in its order dismissing the SAC, *see* ECF No. 54 at 15-16, a parent-subsidiary relationship alone is not enough to impute FCA liability from one company to another.

---

[6] That MorphoTrak apparently submitted claims to Lockheed Martin, rather than directly to the Government, does not make a difference to the Court's analysis here. *See United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 19 (D.D.C. 2011).

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

*See United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Katzir's Floor & Home Design*, 394 F.3d at 1149; *Pecanic*, 2013 WL 774177, at *4-5. Significantly, the TAC does not allege that Safran Global or Safran Security—as opposed to MorphoTrak—submitted or caused to be submitted any false claims. MorphoTrak is not a party in this litigation; rather, it is only a subsidiary of Defendant Safran USA. In addition, although the TAC alleges that several specific employees made "numerous trips" to the United States in the months leading up to the Lockheed Martin contract award, and that these employees were "instrumental" in the contract's negotiation, the TAC does not allege that these employees worked for Safran Global or Safran Security at the time of the contract negotiation. TAC ¶ 24. Instead, the TAC alleges that one of them worked for Sagem and the others worked for "Safran Defendants' Morpho France subsidiary." *Id.* As such, the TAC fails to sufficiently plead that any Defendants submitted or caused to be submitted any false claims related to the Lockheed Martin contract.

### c. The Schedule 70 Contract and DOJ BPA

Finally, Relators identify two other contracts that could conceivably provide reliable indicia that false claims were actually submitted: the GSA Schedule 70 contract and the DOJ BPA. The Court analyzes them in turn. As background helpful in understanding these contracts, "[f]ederal agencies are able to purchase commercial supplies . . . through an on-line shopping service called GSA Advantage[]." *Sandager*, 872 F.Supp. 2d at 804. "When a vendor is qualified to sell products [through GSA Advantage], the GSA agrees to a long-term government-wide contract to allow the products to be sold through GSA Advantage[]. The contracts are referred to as 'Schedule Contracts.'" *Id.*

Here, Relators allege that non-party MorphoTrust, via its CEO Robert Eckel, signed a GSA Schedule 70 contract on or about September 9, 2009. TAC ¶ 29. However, Relators do not specify what products MorphoTrust offered for sale via its Schedule 70 contract.[7] Moreover,

---

[7] If anything, the TAC suggests that MorphoTrust sells *hardware*, *see* TAC ¶ 14, which would make the alleged Russian origin of the fingerprint identification *software* irrelevant to the MorphoTrust contracts.

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

Relators do not allege that MorphoTrust actually made any sales pursuant to its Schedule 70 contract. Significantly, other courts have held that, where a relator failed to allege that any purchases were actually made pursuant to a GSA Schedule Contract, a relator failed to plead "reliable indicia that the claims were actually submitted." *See United States ex rel. Folliard v. Hewlett-Packard Co.*, 272 F.R.D. 31, 34-35 (D.D.C. 2011). Accordingly, because Relators fail to plead that MorphoTrust actually sold specified products pursuant to its Schedule 70 contract, Relators have failed to state a claim. *See United States ex rel. Folliard v. CDW Technology Servs., Inc.*, 722 F. Supp. 2d 20, 36 (D.D.C. 2010) (holding that because the relator did not "specifically allege that the government purchased the 11 products mislisted on the GSA website . . . the Court cannot make the inferential leap that claims were actually submitted for these items" (internal quotation marks omitted)).

A similar analysis applies to MorphoTrust's BPA with the U.S. Department of Justice ("DOJ"). A BPA is "a simplified method of fulfilling repetitive needs for supplies or services by establishing 'charge' accounts with qualified sources of supply." *United States v. Russell*, 990 F.3d 1265, at *1 (9th Cir. 1993) (unpublished). Relators allege that non-party MorphoTrust executed a BPA with the DOJ in December 2012 "for purchases of JABS fingerprint and palm print identification equipment that the Government at the time expressly estimated would exceed $8 billion over the life of the agreement." TAC ¶ 29. However, Relators fail to allege that the DOJ actually made any purchases under the BPA. Accordingly, the fact that MorphoTrust executed a BPA with DOJ does not constitute a reliable indicator that false claims were actually submitted.

Moreover, even if the existence of the DOJ BPA were a reliable indicator that false claims had been submitted, Relators' allegations would still fail because they do not adequately allege a connection between Safran Global or Safran Security and the potential claims that may have been submitted pursuant to the DOJ BPA with MorphoTrust. As with the Lockheed Martin contract discussed above, a parent-subsidiary relationship alone is not enough to impute FCA liability from

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE

one company to another. *See Bestfoods*, 524 U.S. at 61; *Katzir's Floor & Home Design*, 394 F.3d at 1149; *Pecanic*, 2013 WL 774177, at *4-5. Relators do not allege that Safran Global or Safran Security played any role in obtaining the BPA or in submitting any possible claims related to the BPA.

In sum, the Court concludes that Relators' allegations that Defendants fraudulently concealed the Russian origin of Defendants' fingerprint identification technology fail to satisfy Rule 9(b)'s heightened pleading standard. Specifically, Relators failed to sufficiently allege that Safran Global or Safran Security submitted or caused to be submitted any false claims for payment. Even where relators sufficiently plead a fraudulent scheme, the failure to allege a sufficient factual basis connecting the defendants to the scheme render the allegations deficient under Rule 9(b). *See Swoben*, 848 F.3d at 1182.

### ii.    The Antitrust Violations

The Court next addresses whether Relators have sufficiently stated a claim based on the Defendants' alleged antitrust violations. As set forth above, to adequately allege fraud under Rule 9(b), a Plaintiff must allege the "who"—the individual that has allegedly made the misrepresentation. Specifically, "[w]here fraud has allegedly been perpetrated by a corporation, a plaintiff must allege the names of the employees or agents who purportedly made the statements or omissions that give rise to the claim, or at a minimum identify them by title and/or job responsibility." *United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1016 (C.D. Cal. 2015).

In its order dismissing the SAC, the Court held that the SAC's allegations of false certification of compliance with antitrust laws did not satisfy Rule 9(b) because Relators did not adequately allege the "who, when, or where" of the fraudulent certifications. ECF No. 54 at 18-21. Specifically, the SAC alleged only that Defendants and Papillon agreed to divide the market for fingerprint identification products and to refrain from competing in each other's territory. SAC ¶ 2. Relators also alleged that Relator Desbois learned of this agreement during his tenure as

CEO of Morpho Russia. *Id.* ¶ 6. Defendants allegedly certified in writing that they were compliant with the "'full and open competition' requirement attendant to Part B, Subchapter 6, of the Federal Acquisition Regulation, including, but not limited to, compliance with the Sherman Antitrust Act." *Id.* ¶ 23. The Court found these allegations inadequate because Relators did not specify who made the false certifications, when the false certifications were made, or in what context the false certifications were made.

Significantly, the TAC pleads no new facts about the alleged anti-competitive agreements or related alleged false certifications. *See* TAC ¶¶ 2, 6, 30-33. As a result, the TAC's antitrust theory of falsity fails to satisfy Rule 9(b) for the same reasons that led to the SAC's dismissal. Generally alleging that Defendants made written representations certifying compliance with antitrust laws without specifying who made the certifications, when, or in what circumstances is not specific enough under Rule 9(b). *See Modglin*, 114 F. Supp. 3d at 1016; *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 887-88 (N.D. Cal. 2015) (finding that allegations of fraud did not satisfy Rule 9(b) in part because the Plaintiff did not provide sufficient detail on when the alleged misrepresentations were made); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999) (same).

### iii.    The Trade Act Violations

Finally, the Court addresses whether Relators have sufficiently stated a claim based on the Defendants' alleged Trade Act violations. Relators' Trade Act theory suffers a similar fate as Relators' antitrust theory. The SAC alleged that, in general, a product is Trade Act-compliant if it is made in the United States or a "Designated Country" as set forth in the list in FAR 25.003. TAC ¶ 25. The Russian Federation was not a Designated Country, but "Defendants, via Defendants' personnel handling government sales, routinely and regularly falsely certified, in writing," that they had complied with the Trade Act. *Id.* The Court held that the SAC's allegations of false certification of compliance with the Trade Act did not satisfy Rule 9(b) because the allegations did not identify what individuals or job titles committed the false certifications, as required by *Modglin*. ECF No. 54 at 19. Moreover, the SAC did not identify

27

United States District Court
Northern District of California

when such false certifications occurred. *Id.* at 19-20. The TAC pleads no additional facts about the alleged violations of the Trade Act or the related alleged false certifications. *See* TAC ¶¶ 2, 34. As such, the TAC's Trade Act theory of falsity fails to satisfy Rule 9(b). *See Modglin*, 114 F. Supp. 3d at 1016; *Ryan*, 147 F. Supp. 3d at 887-88.

### 4. Denial of Leave to Amend

The Court thus concludes that Relators have failed to plead any claim against any Defendant with the particularity that Rule 9(b) requires. The Court therefore GRANTS Defendants' Motion to Dismiss the Third Amended Complaint. *See Vess*, 317 F.3d at 1107. In addition, because Relators "fail[ed] to cure deficiencies by amendments previously allowed," the Court finds that further amendments would be futile and dismisses the TAC with prejudice. *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892-93 (9th Cir. 2010). In its order dismissing the SAC, the Court notified Relators that "failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice." ECF No. 54 at 24. Despite this warning, the TAC did not allege any new facts related to Defendant Safran USA or the alleged false certifications related to the antitrust or Trade Act theories of falsity, as the Court details above.

Furthermore, as the Court has previously noted in its order staying discovery, ECF No. 56, and its order denying leave to file a fourth amended complaint, ECF No. 83, "[q]*ui tam* suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime." *Bly-Magee*, 236 F.3d at 1019. As insiders, Relators "should be able to comply with Rule 9(b)" based on their insider knowledge. However, in the instant suit, based on the judicially noticed documents, the TAC's new factual allegations related to Defendants' concealment of the Russian origin of their fingerprint identification technology appear to be derived almost exclusively from publicly available information. *See* ECF No. 85-4, Exhibits A-N. This reliance on publicly available information after multiple amendments of the complaint suggests that Relators are not, in fact, "insiders privy to a fraud on the government" and thus cannot allege fraud with the requisite specificity. This also confirms that further amendment would be futile. *See Carvalho*,

629 F.3d at 892-93.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss the TAC with prejudice.

**IT IS SO ORDERED.**

Dated: August 25, 2017

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 15-CV-00746-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE